No. 83,802

IN THE MATTER OF THE APPEAL OF INTERCARD, INC. FROM AN
ORDER OF THE DIVISION OF TAXATION ON ASSESSMENT OF
COMPENSATING USE TAX.

(14 P.3d 1111)

Opinion filed December 8, 2000.

*Richard L. Cram*, of the Kansas Department of Revenue, argued the cause and was on the briefs for appellant Kansas Department of Revenue.

*Mark A. Burghart*, of Alderson, Alderson, Weiler, Conklin, Burghart & Crow, L.L.C., of Topeka, argued the cause and was on the briefs for appellee.

*David Clauser*, of the Kansas Department of Revenue, and *Paull Mines, Sheldon H. Laskin*, and *H. Beau Baez III*, of Washington, D.C., appeared on the *amicus curiae* brief for Multistate Tax Commission.

*S. Lucky Defries*, of Coffman, Defries & Nothern, of Topeka, and *Stephen P. B. Kranz, Diann L. Smith, William D. Peltz, Bobby L. Burgner*, and *J. Hugh McKinnon*, of Washington, D.C., appeared on the *amicus curiae* brief for Committee on State Taxation.

*S. Lucky Defries*, of Coffman, Defries & Nothern, of Topeka, and *Peter J. Brann*, and *George S. Isaacson*, of Brann & Isaacson, LLP, of Lewiston, Maine, appeared on the *amicus curiae* brief for Direct Marketing Association, Inc.

The opinion of the court was delivered by

LOCKETT, J: This is an appeal from a notice of assessment of compensating use tax issued against Intercard, Inc. (Intercard). The Kansas Department of Revenue (KDR) determined that Intercard had a substantial nexus to Kansas for the collection and remittance requirements of the Kansas Compensating Tax Act, K.S.A. 79-3701 *et seq.* Intercard appealed KDR's determination. The Kansas Secretary of Revenue upheld the assessment. Intercard appealed to the Board of Tax Appeals (BOTA). BOTA found that Intercard did not have a substantial nexus with the state of Kansas as required by the Commerce Clause of the United States Constitution and reversed the Secretary's determination. In addition, BOTA found that because KDR's assessment of compensating use tax was based on activity which did not establish a substantial nexus with the state, the Due Process Clause was violated as well. KDR appealed to this court claiming (1) Intercard's contacts in the state of Kansas were a substantial nexus for imposing the Kansas Compensating Tax Act; and (2) reasonable grounds for abating the penalties imposed by KDR do not exist.

In an appeal from an administrative agency decision, a party is limited to the issues it raises at the administrative hearing. *Kim v. Kansas Dept. of Revenue*, 22 Kan. App. 2d 319, 321, 916 P.2d 47, *rev. denied* 260 Kan. 994 (1996). See *In re Appeal of City of Lenexa*, 232 Kan. 568, 587, 657 P.2d 47 (1983). Both parties agree and we find that BOTA's finding as to the Due Process Clause was gratuitous and will not be considered by an appellate court because neither party had argued or briefed the issue.

The parties stipulated that Intercard is a corporation with its headquarters, offices, and manufacturing facility located in Missouri. Kinko's Copies (Kinko's) is Intercard's largest customer and uses Intercard's card reading system exclusively. The national headquarters of Kinko's is located in Ventura, California. The master contract between Kinko's and Intercard was negotiated by company officials in Ventura, California, and St. Louis, Missouri. Intercard has never registered with the Kansas Secretary of State as a foreign corporation doing business in the state of Kansas.

Intercard is in the business of manufacturing and selling electronic data cards and card readers. The system allows a customer to use a card to purchase photocopies. The electronic data cards are of two types, copy cards and store cards. Copy cards are either given or sold to the purchaser's customers for payment of photocopies. The purchaser has discretion to give the copy cards to its customers or to sell them. Store cards are for in-store use only. Intercard sells its products to over 400 Kinko's stores nationwide. No other states subject Intercard to the collection and remittance requirements of its compensating use tax provisions.

Intercard's products are delivered to its customers by United Parcel Service. At times, a Kinko's store that has purchased an Intercard card reader requests that Intercard send a technician to its store to perform the electronic wiring needed to install the card reader, which takes approximately 4 hours. The labor charges for this work are listed separately on the invoice to the customer.

From April 1, 1992, to March 31, 1996, inclusively (audit period), Intercard technicians made 11 visits to Kinko's stores in Kansas to install card readers purchased from Intercard. The 11 contacts Intercard had with Kinko's stores in Kansas occurred during 3 months of the 48-month audit period. The contacts totaled 44 hours. Intercard has not sent technicians into Kansas since the installation of the 11 card readers was completed.

No solicitation took place in Kansas during the audit period regarding the products sold by Intercard. The sale of card readers to Kinko's stores in Kansas resulted from a master contract negotiated between Kinko's and Intercard outside Kansas. Intercard did not

send employees, agents, or sales representatives into Kansas to solicit sales.

On May 21, 1996, KDR conducted a field audit of Intercard's books. KDR determined that Intercard's installation of the card readers was a substantial nexus sufficient to support the imposition of the collection and remittance requirements of the Kansas Compensating Tax Act. As a result of the audit, KDR sent Intercard notices of assessment of Kansas retailers' sales tax of $399, including penalties and interest, and retailers' compensating use tax of $13,297, including penalties and interest. The additional Kansas retailers' sales tax assessment was based on amounts invoiced by Intercard for work its technicians performed in Kansas to install 11 card readers. The additional Kansas retailers' compensating use tax assessment was based on Intercard's sales of tangible personal property to customers located in Kansas during the audit period. Intercard neither billed nor collected retailers' sales or compensating use tax from customers in connection with any of the transactions noted in the audit report.

Intercard appealed KDR's determination to the Kansas Secretary of Revenue. The Secretary upheld the assessment. Intercard appealed to the BOTA. BOTA found that Intercard did not have substantial nexus with the state of Kansas and reversed the Secretary's determination. KDR appealed to this court. Direct Marketing Association, Inc., and the Committee on State Taxation submitted *amicus curiae* briefs in support of Intercard, and the Multistate Tax Commission (MTC) submitted an *amicus curiae* brief in support of KDR's position.

BOTA is a specialized agency that exists to decide taxation issues, and its decisions are given great weight and deference when it is acting in its area of expertise. However, if BOTA's interpretation is erroneous as a matter of law, appellate courts will take corrective steps. *In re Tax Appeal of Univ. of Kan. School of Medicine*, 266 Kan. 737, 749, 973 P.2d 176 (1999) (citing *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, 515, 930 P.2d 1366 [1997]).

BOTA's order abating the sales and compensating use taxes assessed by KDR found:

"[P]ursuant to the first prong of *Complete Auto* [*Transit, Inc. v. Brady*], 430 U.S. [274,] 280, [51 L. Ed. 2d 326, 97 S. Ct. 1076, *reh. denied* 430 U.S. 976 (1977)], the Taxpayer's activities in Kansas must establish a substantial nexus with the state in order for the assessment levied pursuant to K.S.A. 79-3701 *et seq.* to be constitutional as applied to the Taxpayer. The Board finds in this case, that the Taxpayer's activities in Kansas do not constitute a substantial nexus with Kansas. The Taxpayer's eleven visits to Kansas during the four-year audit period do not transcend the slightest physical presence test of *Quill* [Corp. *v. North Dakota*, 504 U.S. 298, 315 n. 8, 119 L. Ed. 2d 91, 112 S. Ct. 1904 (1992)] and *National Geographic* [*v. Cal. Equalization Bd.*, 430 U.S. 551, 556, 51 L. Ed. 2d 631, 97 S. Ct. 1386 (1977)]. These visits were very minor activities in the Taxpayer's business, both in time spent and in revenue generated. They were in response to customer requests; had there been no requests, the Taxpayer would have had no physical contacts with the state. The Taxpayer initiated none of the contacts and did not use the contacts to promote the sales of its products. The Board finds no evidence that the installation activities in Kansas created a market for the card readers that were sold previous to each installation. Furthermore, the Taxpayer's undisputed testimony is that its physical contact with Kansas ended in March of 1994, roughly halfway through the audit period. The Board finds that the Taxpayer's contacts with Kansas were isolated and sporadic and did not establish a substantial nexus. The Board finds because the Department's assessment of compensating use tax is based on activity which does not establish a substantial nexus with the state, the Due Process Clause has been violated as well. The Department's assessment is invalid pursuant to the rule set out in *Quill*, because the Taxpayer's 'connections with the State are not substantial enough to legitimate the State's exercise of power over him.' 504 U.S. at 312."

## APPLICABLE KANSAS TAX STATUTES

K.S.A. 79-3702(h) defines a "retailer doing business" in Kansas as

"[a]ny retailer: (1) [h]aving or maintaining within this state, directly or by a subsidiary, an office, distribution house, sales house, warehouse or other place of business, *or any agent or other representative operating within this state under the authority of the retailer or its subsidiary, irrespective of whether such place of business or agent is located here permanently or temporarily,* or whether such retailer or subsidiary is admitted to do business within the state." (Emphasis added.)

K.S.A. 1999 Supp. 79-3703 imposes a compensating use tax upon

"the privilege of using, storing, or consuming within this state any article of tangible personal property. . . . All property purchased or leased within or without this state and subsequently used, stored or consumed in this state shall be subject to the compensating tax if the same property or transaction would have been

subject to the Kansas retailers' sales tax had the transaction been wholly within this state."

The compensating use tax is a tax imposed upon the purchaser of tangible personal property, but the retailer is charged with the duty of collecting the tax from the consumer. K.S.A. 79-3705a. Every retailer doing business in this state and making sales of tangible personal property for use, storage or consumption in this state, not exempted under the provisions of the use tax act, shall at the time of making such sales, whether within or without the state, collect the tax imposed by this act from the purchaser, and give the purchaser a receipt for the payment. K.S.A. 79-3705c.

## THE COMMERCE CLAUSE

The purpose of the Commerce Clause of the United States Constitution is to ensure a national economy free from unjustifiable local entanglements. *Nat. Bellas Hess v. Dept. of Revenue*, 386 U.S. 753, 760, 18 L. Ed. 2d 505, 87 S. Ct. 1389 (1967). The Commerce Clause expressly authorizes Congress to regulate commerce among the several states. United States Const., art. 1, § 8, cl. 3. The Commerce Clause has been interpreted by the United States Supreme Court to be both an affirmative grant of power to Congress to regulate commerce between the states and an implied prohibition on the states to do the same. *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L. Ed. 23 (1824).

It is well settled that under the Commerce Clause a state may not subject a business to tax unless the business has a substantial nexus within the state. The concept of what contacts constitute a substantial nexus to the taxing state has been the subject of a long line of United States Supreme Court and state court decisions. Of particular significance are the cases we will later discuss.

### Substantial Nexus

KDR asserts that Intercard's 11 installations of card readers in Kansas during the audit period establish a substantial nexus with the State of Kansas, subjecting Intercard to the collection and remittance requirements of the Kansas compensating use tax. KDR asserts that BOTA erroneously applied a substantial physical pres-

ence requirement and improperly minimized the significance of Intercard's installation activities in Kansas. KDR argues that BOTA's characterization of Intercard's contacts with Kansas as "very minor activities in the Taxpayer's business, both in time spent and in revenue generated" is contrary to the facts.

The MTC, in its *amicus curiae* brief, argues that the United States Supreme Court's determination in *Quill Corp. v. North Dakota*, 504 U.S. 298, 119 L. Ed. 2d 91, 112 S. Ct. 1904 (1992), affirms a "safe harbor" for vendors whose only connection with the taxing state is by common carrier or the United States mail. MTC asserts that Intercard's activities in Kansas went outside the safe harbor, thereby exposing Intercard to imposition of the Kansas compensating use tax. The Committee on State Taxation takes issue with the MTC's simplification of the nexus issue and analysis of the United States Supreme Court decisions. The Direct Marketing Association states that Intercard's connection with Kansas is insubstantial and warns that if random, fortuitous physical contacts are sufficient to constitute a substantial nexus, interstate commerce will suffer as companies face burdens of calculating and collecting sales and compensating use taxes for a myriad of jurisdictions across the country.

### United States Supreme Court Decisions

In *Scripto v. Carson*, 362 U.S. 207, 211-12, 4 L. Ed. 2d 660, 80 S. Ct. 619 (1960), the United States Supreme Court held that Florida could constitutionally impose upon a Georgia seller the duty of collecting a state use tax upon the sale of goods shipped to customers in Florida. In that case, Scripto had 10 wholesalers, jobbers, or salesmen conducting continuous local solicitation in Florida and forwarding the resulting orders from that state to Georgia for shipment of the ordered goods. Subsequently, in *Quill*, 504 U.S. at 306, the Court stated that *Scripto* represented the furthest constitutional reach to date of a state's power to deputize an out- of-state retailer as its collection agent for a use tax.

In *Bellas Hess*, 386 U.S. 753, Bellas Hess, a mail-order house, was incorporated in Delaware, had its principal place of business in Missouri, and was licensed to do business only in Delaware and

Missouri. Bellas Hess did not maintain a place of business in Illinois or have agents or representatives in Illinois to sell or take orders, deliver merchandise, accept payments, or service merchandise; it did not own tangible property, real or personal, in Illinois; it had no telephone listing in Illinois; and it did not advertise its merchandise for sale in newspapers, on billboards, or by radio or television in Illinois. Orders for Bellas Hess merchandise were mailed to and accepted at its Missouri plant. Its merchandise was sent to Illinois customers by mail or by common carrier. Bellas Hess mailed catalogs to its Illinois customers twice a year; an occasional advertising flyer was mailed to past and potential Illinois customers, and its sales to Illinois customers were $2,174,744 during the approximately 15 months for which the taxes in issue were assessed. Under *Bellas Hess,* the United States Supreme Court created a "safe harbor" for vendors "whose only connection with customers in the [taxing] State is by common carrier or the United States mail." It stated that such vendors were free from state-imposed duties to collect sales and use taxes. See *Quill,* 504 U.S. at 315. The *Bellas Hess* court fully underscored the "sharp distinction . . . between mail order sellers with retail outlets, solicitors, or property within [the taxing] State, and those [like Bellas Hess] who do no more than communicate with customers in the State by mail or common carrier as part of a general interstate business." *Bellas Hess,* 386 U.S. at 758.

Ten years after *Bellas Hess,* in *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 51 L. Ed. 2d 326, 97 S. Ct. 1076, *reh. denied* 430 U.S. 976 (1977), the United States Supreme Court adopted a four-part test for determining whether a state tax on an interstate business is valid under the Commerce Clause. A Michigan corporation engaged in the business of transporting motor vehicles by motor carrier for General Motors Corporation. General Motors assembled vehicles outside Mississippi that were destined for dealers within the State. The vehicles were shipped by rail to Jackson, Mississippi, where, usually within 48 hours, they were loaded onto Complete Auto's trucks and transported to the Mississippi dealers. Complete Auto was paid on a contract basis for the transportation from the railhead to the dealers. The Supreme Court stated it

would sustain a tax under the Commerce Clause only where the tax is "applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Complete Auto*, 430 U.S. at 279. It noted that the second and third parts of the analysis, requiring fair apportionment and nondiscrimination, prohibit taxes that pass an unfair share of the tax burden onto interstate commerce. The first and fourth prongs, which require a substantial nexus and a relationship between the tax and state-provided services, limit the reach of state taxing authority so as to ensure that state taxation does not unduly burden interstate commerce. See *Quill*, 504 U.S. at 313.

In *National Geographic v. Cal. Equalization Bd.*, 430 U.S. 551, 556, 51 L. Ed. 2d 631, 97 S. Ct. 1386 (1977), the United States Supreme Court declined to adopt a test for physical presence that would be met by "slightest presence." In that case, a nonprofit society, which maintained two offices in California to solicit advertising for its magazine but performed no activities related to the society's mail-order business for the sale of various items from the District of Columbia office, was required by California to collect California use tax from California purchasers. The court found that imposition of the use tax collection burden did not violate due process or the Commerce Clause because the society's continuous presence in California and its two offices provided a sufficient nexus between the society and the state to justify imposition of the use tax collection liability. 430 U.S. at 554-56.

The Court determined that even though there was no relationship between National Geographic's solicitation of magazine advertising and its mail-order business, California was not precluded from imposing the duty to collect use tax for mail-order sales. 430 U.S. at 560. The Court distinguished collection taxes from direct taxes. It noted that a showing that particular transactions are dissociated from the local business is fatal to a direct tax. On the other hand, such dissociation does not bar the imposition of the use-tax-collection duty because such a tax, unlike a direct tax, requires only a connection between the taxing state and the entity it seeks to tax. 430 U.S. at 560-61.

In *Tyler Pipe Industries v. Dept. of Revenue*, 483 U.S. 232, 251, 97 L. Ed. 2d 199, 107 S. Ct. 2810 (1987), the United States Supreme Court held that having resident sales representatives in the taxing jurisdiction to establish and maintain the market constituted a sufficient nexus to impose Washington state business and occupation tax on its sales. KDR asserts that *Tyler* appears to replace or supplement the United States Supreme Court's previous analysis of "substantial nexus." The *Tyler* court stated: "[T]he crucial factor governing nexus is whether the activities performed [in Washington] on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales." 483 U.S. at 250-51.

It is important to note that the tax at issue in *Tyler* was a direct tax on the manufacturer and that the Supreme Court was applying a Washington tax statute and the implementing administrative rule which specifically defined "nexus" as "the activity carried on by the seller in Washington which is significantly associated with the seller's ability to establish or maintain a market for its products in Washington." See Wash. Admin. Code (WAC) 458-20-193(f). Unlike the compensating use tax at issue in this case, the business and occupation tax at issue in *Tyler* was a direct tax imposed on virtually all business activities carried on within the state. See *Simpson Inv. Co. v. Revenue*, 141 Wash. 2d 139, 149, 3 P.3d 741.

In *Quill*, the United States Supreme Court noted that, like *Bellas Hess*, *Quill* involved a state's attempt to require an out-of-state mail-order house that had neither outlets nor sales representatives in the state to collect and pay a use tax on goods purchased for use within the state. The Supreme Court noted that in *Bellas Hess* it held that a similar Illinois statute violated the Due Process Clause of the Fourteenth Amendment and created an unconstitutional burden on interstate commerce. There it ruled that a "seller whose only connection with customers in the State is by common carrier or the United States mail" lacked the requisite minimum contacts with the state. 386 U.S. at 758; see *Quill*, 504 U.S. at 301.

In *Quill*, the Supreme Court of North Dakota had declined to follow *Bellas Hess* because "the tremendous social, economic, commercial, and legal innovations" of the past quarter century had

rendered its holding obsolete. 504 U.S. at 301. The United States Supreme Court noted that it would have to either reverse the Supreme Court of North Dakota or overrule *Bellas Hess*. While the Supreme Court agreed with much of the state court's reasoning, it took the former course. 504 U.S. at 301-02. It held that while the Due Process Clause no longer presented a "physical presence" bar to state taxation, that bar persisted in the Commerce Clause. The *Quill* Court observed that the nexus requirements of due process emanate from a concern over the fundamental fairness of a state's asserting jurisdiction. It stated the Commerce Clause, however, is concerned with the effect of state action on the national economy. While fundamental notions of fair play and substantial justice no longer prevented North Dakota from exerting personal jurisdiction over Quill, the safe harbor for vendors under the *Bellas Hess* rule continued to further the ends of the dormant Commerce Clause. It concluded that physical presence still was a prerequisite for a state to impose a use tax collection duty on an out-of-state vendor. 504 U.S. at 312-15. The Court found that Quill's ownership of floppy diskettes in North Dakota that allowed customers to place orders for out-of-state sales constituted the "slightest presence" but did not rise to the level of a substantial nexus because the Commerce Clause required more than "minimal nexus" for a state to impose collection burdens on a vendor. 504 U.S. at 315, n. 8.

The *Quill* Court, therefore, reaffirmed the rule that a state may not impose a use tax collection duty on an out-of-state vendor whose only connection with the state is through a common carrier or the United States mail. 504 U.S. at 314-15. This "bright line, physical presence" rule was first set out in the court's 1967 decision in *Bellas Hess*, 386 U.S. at 758. The continuing value of a bright line rule in this area of law and the doctrine and principles of stare decisis indicate that the *Bellas Hess* rule remains good law. *Quill*, 504 U.S. at 317.

Justice White stated in his concurring opinion in *Quill* that "[r]easonable minds surely can, and will, differ over what showing is required to make out a 'physical presence' adequate to justify imposing responsibilities for use tax collection." Therefore, "the

vagarities of 'physical presence' will be tested to their fullest in our courts." 504 U.S. at 330-31.

## State Court Decisions

Some state courts have minimized the concept of substantial physical presence to uphold imposition of use tax collection and duties on out-of-state companies. KDR relies on such a case, *Orvis Co. v. Tax Tribunal*, 86 N.Y.2d 165, 630 N.Y.S.2d 680, 654 N.E.2d 954 (Ct. App. 1995), to support its argument that Intercard's contacts with Kansas constitute a substantial nexus.

*Orvis* is a consolidated case which involved two Vermont mail-order businesses. One taxpayer, Orvis, had no offices, property, or personnel in New York. On 12 occasions over a 3-year period, Orvis personnel entered New York to communicate with retailers that sold Orvis products and solicited sales that were subject to approval at the company's out-of-state headquarters. The other taxpayer, Vermont Information Processing, Inc. (VIP), a mail-order marketer of computer software, also had no offices, outlets, telephone number, employees, or general advertising in New York. On approximately 40 occasions over a 3-year period, VIP personnel entered New York to correct software problems for customers, and, occasionally, install software and train the customer's employees.

The New York Court of Appeals held that both Orvis and VIP had failed to prove they had less than a slight presence in New York. In so doing, the court held that *Quill* requires merely "demonstrably more than a 'slightest presence' " to meet the nexus requirements of the Commerce Clause. In reaching this conclusion, the court rejected the "substantial physical presence" requirement formulated by the New York Appellate Division, stating:

"We do not read *Quill Corp. v. North Dakota* to make a substantial physical presence of an out-of-State vendor in New York a prerequisite to imposing the duty upon the vendor to collect the use tax from its New York clientele. The Appellate Division erroneously applied that exacting standard in both cases." 86 N.Y.2d at 170.

The *Orvis* court cited *National Geographic* as its source for the "more than slightest presence" standard. 86 N.Y.2d at 178. In *National Geographic* the United States Supreme Court stated, in re-

sponse to the California court's adoption of a "slightest presence" standard for finding a substantial nexus:

"Our affirmance of the California Supreme Court is not to be understood as implying agreement with that court's 'slightest presence' standard of constitutional nexus. Appellant's maintenance of two offices in the state and solicitation by employees assigned to those offices of advertising copy in the range of $1 million annually, . . . establish a much more than substantial presence than the expression 'slightest presence' connotes. Our affirmance thus rests upon our conclusion that appellant's maintenance of the two offices in California and activities there adequately establish a relationship or 'nexus' between the Society and the State that renders constitutional the obligations imposed upon appellant pursuant to §§ 6203 and 6204. This conclusion is supported by several of our decisions." 430 U.S. at 556.

It was from this statement by the United States Supreme Court that the *Orvis* court adopted a "more than slightest presence" as the standard for finding a substantial nexus. We believe that the *Orvis* court missed the point that the Supreme Court was making about National Geographic's presence, *i.e.*, that it had a "much more substantial presence than a 'slightest presence' in the taxing state.

The *Orvis* court went on to expound the holding of *Quill*:

"The true holding *Quill Corp. v. North Dakota* can best be understood by considering the case in the context of its position in the evolution of Supreme Court doctrine limiting the authority of a State to assess or impose a duty to collect taxes arising out of the economic activity of a foreign business engaged in interstate commerce." 86 N.Y.2d at 170.

"[B]oth the literal language of the *Quill* decision and consideration of its place in the evolution of Supreme Court Commerce Clause jurisprudence refute the Appellate Division's conclusion, urged by Orvis and VIP here, that '*Quill* . . . increased the requisite threshold of in-State physical presence from any measurable amount of in-State people or property to substantial amounts of in-State people or property.' [Citation omitted.] *Quill* simply cannot be read as equating a substantial physical presence of the vendor in the taxing State with the substantial nexus prong of the *Complete Auto* test, as the Appellate Division's interpretation would require." 86 N.Y.2d at 176.

"We think the foregoing survey of the decisional law discloses the true import of the physical presence requirement within the substantial nexus prong of the *Complete Auto* test under contemporary Commerce Clause analysis. While a physical presence of the vendor is required, it need not be substantial. Rather, it must be demonstrably more than a "slightest presence." [Citation omitted.] And it may

be manifested by the presence in the taxing State of the vendor's property or the conduct of economic activities in the taxing State performed by the vendor's personnel or on its behalf." 86 N.Y.2d at 178.

The *Orvis* court ignores the *Quill* holding that sufficient physical presence is a necessary element of the nexus required for a state to impose a use tax collection duty. Economic presence cannot negate this requirement. The *Quill* Court was wholly unconcerned with any economic benefit resulting from the continuous physical presence of a "few floppy diskettes" in North Dakota. Rather, *Quill* affirmed the "bright line" rule of *Bellas Hess* that the Commerce Clause protects out-of-state vendors from the imposition of use tax requirements where those vendors have no physical presence in the taxing state. The *Quill* Court admitted that the bright line test appears artificial at its edges:

"Whether or not a State may compel a vendor to collect a sales or use tax may turn on the presence in the taxing State of a small sales force, plant, or office. [Citation omitted.] This artificiality, however, is more than offset by the benefits of a clear rule. Such a rule firmly establishes the boundaries of legitimate state authority to impose a duty to collect sales and use taxes and reduces litigation concerning those taxes. This benefit is important, for as we have so frequently noted, our law in this area is something of a 'quagmire' and the 'application of constitutional principles to specific state statutes leaves much room for controversy and confusion and little in the way of precise guides to States in the exercise of their indispensable power of taxation.' [Citation omitted.]" *Quill*, 504 U.S. at 315-16.

The Michigan Court of Appeals adopted the reasoning of *Orvis* in *Magnetek, Inc v Treasury Dep't*, 221 Mich. App. 400, 562 N.W.2d 219 (1997). *Magnetek* did not involve sales or use taxes, but a direct tax on the corporation. The Michigan Department of Treasury had assessed single business tax liability to Magnetek Controls, Inc. (Magnetek), a Michigan based manufacturer. The issue was whether Magnetek was required to apportion certain sales to the states in which it did business or whether those sales were allocable to Michigan. Central to the issue was the fact that Magnetek's managers annually traveled into each of the several states for approximately 2 weeks of solicitation-related activities. Independent commission agents handled the sale of merchandise in the target states.

The Michigan court initially focused on whether this enterprise qualified as a type of small sales force that *Quill* suggested would establish physical presence. The court stated: "The dispositive question becomes whether plaintiff's employees by virtue of the annual two weeks of solid sales effort, along with the activity of independent sales representatives permanently located in the states and selling plaintiff's lines along with those of other companies, qualify as the kind of 'small sales force' that the Supreme Court suggested would suffice." 221 Mich. App. at 408. The court then focused on the rationale of *Orvis*:

"Of the many precedents cited by both parties from other jurisdictions applying *Quill*, we find *In re Orvis Co., Inc. v. Tax Appeals Tribunal of the State of New York*, 86 NY2d 165, [630 N.Y.S.2d 680,] 654 NE2d 954 (1995), most instructive. After a complete review of *Quill* in the context of *Bellas Hess* and other Supreme Court precedents, the court in *Orvis* rejected the taxpayer's claim that *Quill* increased the in-state physical presence requirement of the substantial nexus analysis to require ' " 'substantial amounts of in-State people or property.' " ' [Citation omitted.] The court in *Orvis* noted that neither *Bellas Hess, Quill,* or surrounding Supreme Court cases express 'any insistence that the physical presence of the interstate vendor be substantial. . . .' [Citation omitted.] Further requiring that physical presence be substantial would 'destroy the bright-line rule the Supreme Court in Quill thought it was preserving'; it would require a 'weighing of factors such as number of local visits, size of local sales offices, intensity of direct solicitations, etc.' to determine whether there was 'substantial' physical presence in the target state. [Citation omitted.] Finally, the court in *Orvis*, supra at 178, noted that in a recent case, *Oklahoma Tax Comm. v. Jefferson Lines, Inc.*, 514 US [175]; 115 SCt 1331; 131 LEd2d 261 (1995), the Supreme Court 'did not apply a substantial physical presence test, but instead strictly utilized the substantial nexus prong of the *Complete Auto* test without even passing reference to the substantiality of the physical presence of the vendor . . . in the taxing State.' " 221 Mich. App. at 410-11.

The *Magnetek* court applied the *Orvis* standard of "more than a slightest presence." Based on that analysis, the Michigan court found that Magnetek had sufficient physical presence to make it susceptible to imposition of a tax obligation by those states, notwithstanding Commerce Clause restrictions. Sales by Magnetek to taxpayers in those states during the audit period could not be attributed to Michigan for purposes of single business tax liability. 221 Mich. App. at 411-12.

Florida adopted a standard more consistent with *Quill*. In *Florida Department of Revenue v. Share International, Inc.*, 676 So.2d 1362 (Fla.1996), a Texas mail-order vendor that had no offices or employees in Florida conducted a seminar in Florida for 3 days each year. Share's products were displayed and sold at the seminar. The Florida Supreme Court held there was not a substantial nexus with the state for purpose of collecting use tax on the company's mail-order sales. 676 So.2d at 1363. In reaching its decision the *Share* court focused on the substantiality of Share International's physical presence in the state and found it insufficient.

In *Koch Fuels, Inc. v. Clark*, 676 A.2d 330 (R.I. 1996), Koch, a Delaware corporation headquartered in Wichita, Kansas, was engaged in the sale and distribution of fuel oil. On several occasions between 1982 and 1984, Koch sold fuel oil to New England power for the generation of electricity in Rhode Island. The fuel oil sold to the Rhode Island company originated in Texas, Pennsylvania, or Massachusetts. All shipments were delivered by common carriers using barges or vessels.

The terms of each of the sales contracts were negotiated and agreed upon in telecommunications between Koch's representatives in Texas or New Jersey and New England Power's representatives in Massachusetts. The Rhode Island company received invoices for and paid the purchase price of the fuel oil outside Rhode Island. The terms of each of the sales contracts were f.o.b. Providence, indicating that title possession and risk of loss surrounding the fuel-oil shipments passed from Koch to the Rhode Island company in the State of Rhode Island. Koch did not have employees in Rhode Island, nor rent, lease, or own real property within Rhode Island. Koch did, however, register to do business in Rhode Island and paid Rhode Island corporate taxes for the years it sold fuel oil to New England Power.

The Rhode Island Supreme Court first determined that Koch's activities fell outside the "safe harbor" of mere "communication with its customers in the State by mail or common carrier." 676 A.2d at 334. Based on Koch's complete control over the oil shipments, the exclusive nature of the common carrier's contract, the unique nature of the cargo, and the fact that the sales were con-

summated upon delivery in Rhode Island, the *Koch* court determined that Koch's activities created a physical presence within Rhode Island sufficient to satisfy the substantial nexus requirement of the *Complete Auto* test. 676 A.2d at 334.

After briefs were filed, KDR submitted additional authority to support its position. One case cited by KDR as additional authority, *Town Crier, Inc. v. Department of Revenue*, 315 Ill. App. 3d 286, 733 N.E.2d 780 (2000), a Wisconsin retailer, Town Crier, Inc., (Town Crier), contested the assessment of Illinois use tax. The Illinois Department of Revenue argued that Town Crier had a taxable nexus in Illinois by delivering furniture to Illinois customers in Town Crier vehicles and by installing window treatments in Illinois. Town Criers sales records revealed that, for the sampling period, over 50 percent of its gross sales constituted sales of merchandise delivered into Illinois. During the audit period, Town Crier had made at least 54 deliveries of merchandise to Illinois. Of the 54 deliveries, 30 were made in Town Crier's vehicles and 24 were made by common carriers. Town Crier had installed window dressings in Illinois on five occasions. The Illinois court concluded:

"By making deliveries into Illinois in its own vehicles, plaintiff has established a regular presence in Illinois that enhanced its ability to establish and maintain a market for its furniture sales. Plaintiff could have avoided use tax collection responsibilities in Illinois by merely restricting its deliveries in this state to common carriers or by refusing to deliver goods and supply services to Illinois. However, instead of using these safe harbors, plaintiff chose to send its own personnel into Illinois on multiple occasions and to reap the benefits from doing so. By repeatedly making deliveries and performing installations in Illinois, plaintiff's presence was demonstrably more than slight. Thus we find there was a substantial nexus with plaintiff's activities and the State of Illinois, satisfying the first requirement of the *Complete Auto* test." 315 Ill. App. 3d at 294.

The other case submitted by KDR is *Arizona Department of Revenue v. Care Computer Systems, Inc.*, 197 Ariz. 414, 4 P.3d 469 (Ct. App. 2000), involves Arizona Department of Revenue's appeal from the State Board of Tax Appeals' order vacating a retail transaction privilege tax imposed on Care Computer Systems, Inc., (Care) an out-of-state taxpayer who sold and licensed computer hardware and software to nursing homes. Care did not own or lease any real property in Arizona and did not maintain an inventory,

have a business address in Arizona, or have employees, independent contractors, or agents based or residing in Arizona. During the audit period, Care engaged in approximately 180 transactions with Arizona nursing homes. The majority of Care's Arizona transactions were conducted by mail or telefax orders. Care had one salesperson assigned to Arizona., who lived in California during the audit period.

On seven occasions in the 7-year audit period, the Care salesperson took 1- to 2-day trips to Arizona to follow up on business prospects. Some sales resulted from the trips. Training was provided to Care's Arizona customers by personnel from Care who went to the nursing home site once. The training sessions lasted one to several days, depending on the number of computer programs involved. The cost of the training was insignificant compared to the cost of the hardware and software purchased by the nursing homes. Trainings were held in Arizona 80 out of 1,370 days covered by the audit, amounting to approximately 21 days per year.

The *Care* court relied on the Supreme Court's declaration in *Tyler Pipe Industries v. Dept. of Revenue*, 483 U.S. 232, 97 L. Ed. 2d 199, 107 S. Ct. 2810 (1987), that the crucial determination in Commerce Clause nexus requirements was whether the business activities in the State were significantly associated with establishing and maintaining a market for the business' sales. 197 Ariz. at 415-16. Finding that Care's in-state activities were associated with establishing and maintaining a market for the business' sales in Arizona, the court found a substantial nexus.

### Kansas Case

In *In re Tax Appeal of Scholastic Book Clubs, Inc.*, 260 Kan. 528, 920 P.2d 947 (1996), this court considered the question of whether Scholastic Book Clubs, Inc. (Scholastic), an out-of-state based business that sold books ordered through Kansas elementary school teachers, had established a sufficient nexus with Kansas to subject it to the Kansas compensating use tax. The *Scholastic* court found that by soliciting orders, accepting payments and shipping merchandise to teachers for distribution to the student purchasers, Scholastic had made the Kansas teachers its implied agents. 260

Kan. at 541. The *Scholastic* court applied the test set out in *Bellas Hess* and *Quill* and concluded that Scholastic's use of implied agents, the Kansas teachers, to sell its product to Kansas students provided a substantial nexus sufficient for the State to impose the collection and remittance duties of the use tax upon Scholastic. 260 Kan. at 546.

In summary, the Commerce Clause requires a taxing state to have substantial nexus with an out-of-state business to impose use tax collection and remittance duties. See *Complete Auto*, 430 U.S. at 279. Substantial nexus requires a finding of physical presence in the taxing state. *Bellas Hess,* 386 U.S. at 758. The continuous physical presence of offices and employees in a taxing state is sufficient to impose a use tax collection duty even though the in-state presence is unrelated to the transaction being taxed. *National Geographic,* 430 U.S. at 560. Mail-order sales without more are a "safe harbor" for out-of-state vendors. *Bellas Hess,* 386 U.S. at 758. A slightest presence is not sufficient to establish a substantial nexus, *National Geographic,* 430 U.S. at 556, but some states have found that "more than a slightest presence" is sufficient. *Orvis,* 86 N.Y.2d at 178. The physical presence requirement may turn on the presence in the taxing state of a small sales force, plant, or office. *Quill,* 504 U.S. at 315.

The question is whether Intercard's installation activities in the state of Kansas constitute a physical presence sufficient to establish a substantial nexus with the state. The parties stipulated that Intercard was not incorporated or registered as a foreign corporation doing business in Kansas; all contracts and sales occurred outside of Kansas; and Intercard had no offices or employees in Kansas. BOTA found that Intercard's 11 incursions to install cardreaders in Kansas were isolated, sporadic, and insufficient to establish a substantial nexus to Kansas. We agree and affirm BOTA's order abating the assessed sales and use tax.